# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

| | | |
|---|---|---|
| TIMOTHY MANGES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CAUSE NO. 3:11-CV-369 PPS |
| | ) | |
| TERRY HARMAN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

Plaintiff Timothy Manges, an inmate at the Indiana State Prison, is a man who zealously defends his rights. He is a serial grievance filer. By Manges' own reckoning, he has filed more than sixty grievances over the years; Defendants say it's closer to one hundred. This case arises out of the many grievances Manges filed between 2009 and 2011 while at the Indiana State Prison ("ISP").

Manges is a member of the Eastern Orthodox Christian faith, and, at various times during his confinement at ISP, Manges was prevented from attending Eastern Orthodox liturgical services. The reasons vary—one time, services were cancelled for construction, another time he was disciplined for insubordination. At another time he was accidentally left off the pass list. Manges alleges that these incidents infringed his First Amendment right to exercise his religion, and has brought this lawsuit against six ISP staff members he alleges are responsible. He also alleges that three Defendants retaliated against him for filing grievances.

Manges seeks summary judgment on his retaliation claims against one Defendant, ISP Chaplain Terry Harman [DE 127]. As I'll explain, I think there are still genuine issues of fact that preclude judgment at this time, so I will deny Manges' motion. Meanwhile, Defendants have moved for summary judgment as well [DE 119]. This motion will be **GRANTED IN PART** and **DENIED IN PART**. Defendants are entitled to judgment on the bulk of Manges' claims but he has come forward with just enough evidence to support two of his retaliation claims, so those claims will have to proceed to trial.

## BACKGROUND

Timothy Manges is a prisoner in the Indiana state system. From March 2002 until March 2012 he was housed at the Indiana State Prison in Michigan City, Indiana. Since 2012, he's been housed at the Pendleton Correctional Facility in Pendelton, Indiana. This lawsuit concerns Manges' last few years at ISP.

Manges is a member of the Eastern Orthodox Christian faith and was an active member of the Eastern Orthodox community at ISP. The Eastern Orthodox community is one of the smaller faith communities at ISP, but every week an Orthodox priest or lay volunteer comes to preside over a liturgical service at ISP's Religious Center.

Manges' trouble began in September 2009, when he discovered that he had been left off of the Eastern Orthodox "count letter." A count letter is simply a list of the prisoners authorized to attend an event, in this case, the Eastern Orthodox service. If a prisoner's name was on the count letter, the guard at the checkpoint would allow him

into the Religious Center. If his name wasn't on the list, no such luck. In September

2009, ISP had issued updated count letters after coming off of lockdown, and, due to a

clerical error, Manges was left off. As a result, he was not able to attend the first two

Orthodox services in September. Manges complained about the oversight to the ISP

chaplains Terry Harman and David Rogers, who said they would look into it [DE 120-9

at 1]. According to Manges, when the problem still hadn't been cleared up by

September 19, Chaplain Rogers issued him a same-day pass so that he could attend

services despite being left off the count letter. *Id.* Rogers denies that he could have done

this [DE 120-3 ¶ 7].

Things came to a head the next week, September 26. Manges set off to go to

Orthodox services only to find, yet again, he was not on the count letter. Manges then

went to Chaplain Harman to request a pass so that he could attend anyway. Harman

refused, citing prison regulations barring same-day passes. Manges lost his temper. He

told Harman that he was doing a lousy job, was incompetent, and that all the people

working for him were incompetent too [DE 120-2 at 7]. Harman said Manges went

further than that. According to Harman, Manges threatened him, saying "maybe I'll just

have to kill some motherfucker to get back on the list" [DE 120-1 ¶ 10; DE 120-9 at 2].

Manges denies this [DE 139 ¶ 7]. Curiously Harman didn't report the threat. He later

said that he was planning on just "letting it go" to help Manges out [DE 120-1 ¶ 12].

Manges, never one to let things go, filed a grievance about being left off of the

count letter [DE 120-9 at 1]. When Harman was asked for his side of the story, he told

3

prison officials about Manges' threat [DE 120-9 at 2]. After learning about the threat,

Chaplain Rogers punished Manges by barring him from all Religious Center activities

for thirty days [DE 120-10]. Manges was not otherwise disciplined by ISP because

Harman had not reported the threat within five days of the incident, as ISP policy

required. *Id.*

The next incident occurred nearly a year later, in June 2010. On June 5, 2010,

Chaplain Rogers cancelled Eastern Orthodox services after the Orthodox volunteer,

Peter Bylen, called the prison and told them he couldn't make it in [DE 120-3 ¶ 12; DE

120-11 at 6]. Bylen, though not a priest, usually led Orthodox services at ISP. A

substitute volunteer ended up reporting to ISP that day, but, according to Rogers it was

too late to reverse course by the time the substitute showed up. *Id.* A couple of weeks

later, on June 30, Bylen called off again, leading to another cancelled service. *Id.* Manges

filed grievances in response to both cancellations [DE 120-11 at 1, 7].

After a long period of relative peace, Chaplain Harman and Manges clashed

again in April 2011. Peter Bylen requested that Manges be allowed to help set up the

Religious Center for the Orthodox community's Easter service [DE 139-2 at 27]. Manges

had been part of similar set-up and tear-down crews in the past [DE 139-2 at 30]. But

this time Harman denied the request. Harman barred Manges from all non-essential

religious activities, including the set-up crew [DE 120-12 at 1]. As Harman explained in

an April 25, 2011 memo to Manges, Manges could still attend services and go to

counseling sessions, but Harman was not going to allow him to help set up for

ceremonies. *Id.* at 3. Harman explained that he needed to be able to trust the members of the set-up crew, and he did not trust Harman because of his history of angry outbursts. *Id.* Manges responded by filing a grievance [DE 120-12 at 4].

Then, in May, the roof of the Religious Center started leaking. The hole in the roof was large enough that debris fell inside the building, at which point, all religious services at ISP were cancelled while ISP fixed the roof [DE 120-13 at 1]. By early June, prison administrators found alternative venues for holding religious services. Nevertheless, Orthodox services remained cancelled for a few more weeks because the volunteer, Peter Bylen, was unavailable due to a family emergency. *Id.* Again, Manges filed grievances [DE 120-13 at 5].

By this point, Harman had had enough. On June 25, 2011, he interrupted the Eastern Orthodox service to pull Manges, Bylen, and the Orthodox priest aside for a meeting about Manges' behavior. According to Harman, the meeting was simply a "counseling session about the general doctrines of [Manges'] chosen faith"[DE 120-1 ¶ 16]. Harman told Manges that his practice of constantly filing grievances was legalistic and out of line with Orthodox teaching. *Id.*

Manges tells a different story. In his telling, Harman was aggressive and threatening from the start, exclaiming "I am tired of all your paperwork and grievances and it is going to stop" [DE 139 ¶ 2]. Manges denies that the meeting was a religious counseling session at all—Harman's sole intention was to deter him from filing grievances. Manges claims the only time faith came up was when Harman told him

"You cannot be Orthodox because of your legalistic mind-set and you need to consider whether you are a Christian or not." *Id.* Naturally, Manges filed a grievance [DE 120-14].

In the late summer of 2011, ISP went into a state of lockdown. During a lockdown, all religious services are suspended. The lockdown ended in late August, but religious services did not start up again for a few weeks because it took the chaplains some time to put together updated count letters [DE 120-1 at 3]. Manges, again, filed a grievance [DE 120-15 at 9].

Mercifully, that appears to be the last of Manges' conflicts with ISP chaplains. There is one final incident at issue in this suit. In March 2012, ISP Superintendent William Wilson recommended Manges' transfer from ISP to his current facility, Pendleton [DE 139-3 at 21 ]. Manges claims Wilson did this in retaliation for this lawsuit and Manges' past grievances.

## Procedural Background

Manges filed this lawsuit, *pro se*, in LaPorte County Circuit Court in June 2011, alleging ISP officials violated his federal and state constitutional rights by failing to ensure that he could practice his religion [DE 1]. Defendants removed the case to federal district court, and, in January 2012, Manges filed an amended complaint that dropped his state law claims [DE 2: DE 12]. The amended complaint alleged, pursuant to 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act , that ISP officials violated Manges' civil rights by denying his freedom to exercise his religion

and by retaliating against him for filing grievances.

Pursuant to 28 U.S.C. § 1915A, I screened the amended complaint for frivolous or inadequate claims [DE 18]. I dismissed the RLUIPA claims, but ultimately granted leave to proceed on nine § 1983 claims against six Defendants. The six Defendants are ISP chaplain Terry Harman, ISP chaplain David Rogers, ISP assistant superintendent Dan McBride, ISP assistant superintendent Ron Neal, ISP superintendent William Wilson, and Westville Correctional Facility superintendent Mark Levenhagen. Defendants are sued in their personal, rather than official, capacity.

As for the claims, Manges alleges six violations of the First Amendment's free exercise clause. Count One is based on the inadvertent removal of Manges from the Eastern Orthodox count letter in September 2009. Count Two is based on Manges' October 2009 suspension from religious activities after he allegedly threatened Chaplain Harman. Counts Four and Five are based on the June 2010 cancellations when Bylen couldn't make it to the prison. Count Seven is based on the fact that there were no services between May 2011 and mid-June 2011 due to construction on the Religious Center roof and cancellations by Bylen. And Count Nine concerns the period in August and September 2011 when services were cancelled as the chaplains updated count letters.

In addition, Manges has alleged four retaliation claims. Count Three alleges Harman retaliated against Manges for filing a grievance by reporting that Manges had threatened him. Count Six alleges Harman, aided by McBride and Wilson, retaliated

against Manges by restricting him to essential activities in April 2011. And Count Eight alleges Harman, again aided by McBride and Wilson, retaliated against Manges by threatening him at a June 2011 meeting. In addition, Manges has filed a supplementary retaliation claim against Wilson, alleging Wilson retaliated against him by having Manges transferred out of ISP [DE 34-1].

Defendants have now moved for summary judgment, arguing that Manges has not come forward with sufficient evidence to support any of his claims [DE 119]. Manges has likewise moved for summary judgment. He argues that the undisputed facts show he is entitled to judgment on the retaliation claims against Harman [DE 127]. These motions are now ripe for disposition.

## DISCUSSION

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To determine whether a genuine issue of material fact exists, I must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003).

### A.    Plaintiff's Motion for Summary Judgment

I'll begin with Manges' motion. Manges argues that he is entitled to summary judgment on his retaliation claims against Defendant Terry Harman, which are Counts Three, Six, and Eight of the Amended Complaint [DE 12].

Before digging into the substance of the motion, there is a procedural issue that I need to take care of first. Local Rule 56.1 sets forth specific requirements for both the party moving for summary judgment as well as for the non-moving party. It directs the moving party to file a "'Statement of Material Facts' that identifies the facts that the moving party contends are not genuinely disputed." N.D. Ind. L.R. 56.1(a). Manges did this [DE 128 at 2-3]. The party opposing the summary judgment motion must then respond to each of the purported undisputed facts with a "Statement of Genuine Issues" setting forth "the material facts that the party contends are genuinely disputed so as to make a trial necessary." N.D. Ind. L.R. 56.1(b)(2). Defendants did not do this. Thus they have not disputed any of the facts set forth in Manges' Statement of Material Facts. Manges' Statement of Material Facts will therefore be deemed admitted unless the facts are unsupported by the evidence or contradict each other. *See Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("[w]e have consistently held that failure to respond by the nonmovant as mandated by the local rules results in an admission"); *Michas v. Health Cost Controls of Ill.,Inc.*, 209 F.3d 687, 689 (7th Cir. 2000) (same).

That doesn't mean Manges automatically prevails. Even where an opposing party completely fails to respond to a summary judgment motion, Rule 56(e) permits judgment for the moving party only "*if appropriate* - that is, if the motion demonstrates that there is no genuine issue of material fact and that the movant is entitled to

judgment as a matter of law." *LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 392 (7th Cir.1995) (quoting *Johnson v. Gudmundsson*, 35 F.3d 1104, 1112 (7th Cir.1994) (emphasis in original)). So even if certain material facts are undisputed, I still must ascertain that judgment is proper "as a matter of governing law." *Id*.

To prevail on his § 1983 claim for First Amendment retaliation, Manges must show that (1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was "at least a motivating factor" in the Defendant's decision to take the retaliatory action. *Gomez v. Randle*, 680 F.3d 859, 866 (7th Cir. 2012) (quoting *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009)). If Manges can make a prima facie case of retaliation, the burden then shifts to Defendants to show that they would have taken the action despite the bad motive. *Mays v. Springborn*, 575 F.3d 643, 650 (7th Cir. 2009).

Manges alleges Harman retaliated against him on three occasions. First Harman reported that Manges had threatened him after Manges filed a grievance for being left off the Orthodox count letter in September 2009. Next, Harman barred Manges from non-essential Religious Center activities in April 2011, which prevented Manges from helping to set-up for the Easter service. Finally, Harman met with Manges in June 2011 to threaten him about his filing so many grievances.

Manges claims that the acts of retaliation were in response to his grievances. So at the outset I can say that Manges has established the first element of a § 1983 retaliation claim as his grievances were protected by the First Amendment. Prisoners

have a First Amendment right to make grievances about conditions of confinement. *Gomez*, 680 F.3d at 866; *Watkins v. Kasper*, 599 F.3d 791, 798 (7th Cir. 2010). In order to determine whether he has established the other two elements of a prima facie case, I'll have to analyze each incident in turn.

### 1.     The threat against Harman

The first alleged retaliatory act is Harman reporting that Manges threatened him. Here's what we're looking at: Manges confronted Harman on September 26, 2009 about being left off of the Orthodox count letter. The two had a heated conversation, but, initially, that was all. Harman did not make a disciplinary report after the incident. Then Manges filed a grievance [DE 120-9 at 1]. When asked for his side of the story, Harman reported that Manges had made a threat. Manges is supposed to have stated "maybe I'll just have to kill some motherfucker to get back on the list" *Id.* at 2; DE 128 at 2. This threat led to Chaplain Rogers disciplining Manges by barring him from religious services for a month [DE 128 at 2; DE 120-10].

Even taking into account Manges' Statement of Facts, I see plenty of unresolved factual issues. First and foremost, did Harman lie about Manges making a threat? Harman says he didn't lie; Manges says he did [DE 120-1 ¶ 10; DE 139 ¶ 7]. This is a question of witness credibility that I simply can't resolve at the summary judgment stage. *Springborn*, 575 F.3d at 650.

Manges argues summary judgment is appropriate even if Harman *isn't* lying. That is, even if Manges had threatened to kill someone, Harman unlawfully retaliated against him when he told administrators about it. Now, it's true that an otherwise

lawful act can be actionable under § 1983 if it was taken in retaliation for the exercise of a protected activity. *Bridges v. Gilbert*, 557 F.3d 514, 552 (7th Cir. 2009); *Howland v. Kiquist*, 833 F.2d 639, 644 (7th Cir. 1987). Manges points out that Harman only reported the threat when answering the grievance. So the grievance was a "motivating factor" for Harman's response by definition. Manges is being too clever by half here. It isn't enough just to prove causation in that narrow sense, Manges has to prove that the grievance caused Harman to *retaliate*—as in, punish Manges for, or dissuade him from, filing grievances. So the key question is whether Harman reported the threat *in retaliation* for the grievance or whether he did it because he had to. *See Babcock v. White*, 102 F.3d 267, 275 (7th Cir. 1996) ("[T]he ultimate question is whether events would have transpired differently absent the retaliatory motive."). This is a question about Harman's motive and it is disputed. Harman argues that he was forced to tell administrators about it in order to properly respond to the grievance [DE 120-1 ¶ 12]. Manges argues that Harman's disclosure was gratuitous and intended to punish him. The resolution of this issue, again, depends on Harman's credibility and cannot be decided as a matter of law.

### 2. Removal from non-essential activities

The next retaliatory incident is when Harman barred Manges from all non-essential Religious Center activities in April 2011. What happened here was that Manges was one of about ten prisoners who, at the request of Peter Bylen, the Orthodox volunteer at ISP, were allowed to prepare the Religious Center for Orthodox Christian events. For example, Manges was apparently part of the crew that set up for the

Christmas service in 2010 [DE 139-2 at 30]. In April 2011, Bylen sent in his request for a set-up crew for the Easter service [DE 139-2 at 27]. Harman approved all of the requested names except Manges. On April 25, 2011, he sent Manges a letter stating that Manges was only allowed to participate in Religious Center activities pertaining directly to religious observances or counseling sessions arranged by a chaplain [DE 120-12 at 1]. As a result, Harman had removed Manges from the set-up crew. *Id*. Manges claims he was removed in retaliation for filing grievances.

There are factual disputes here, too, that preclude summary judgment. First, there is a question of causation. Harman claimed that he removed Manges because of his obnoxious behavior, and not the grievances. This seems plausible enough to me. As Harman explained at the time, "Manges anger outburst and foul language on a previous occasion at checkpoint 7 (in my presence) has caused me to be leary (sic) of his involvement at chapel, except for required religious functions" [DE 139-2 at 22]. If Harman removed Manges from the set-up crew because of Manges' disruptive conduct, and not because of the grievances, that would be permissible. Whether this is what motivated Harman is, again, a question of credibility that cannot be decided as a matter of law.

There is an additional problem with Manges' prima facie case. I find it very unlikely that Harman's actions, even if retaliatory, would deter an ordinary person in exercising their First Amendment rights. They certainly did not deter Manges. I am going to address this issue in detail later on, but for now I'll just say that if a prison guard's violent threats wouldn't deter an ordinary person, *see Antoine v. Uchtman*, 275 F.

App'x 539, 541 (7th Cir. 2008), I don't see how this modest penalty would do the trick.

### 3. June meeting

Finally, Manges alleges that Harman retaliated against him by threatening Manges at a private meeting. On June 25, 2011, Harman interrupted Orthodox services to have a meeting with Manges, Bylen, and the Orthodox priest [DE 128 at 3]. Harman opened the meeting by telling Manges "I am tired of all your grievances and paperwork and it is going to stop." *Id*. He then proceeded to berate Manges for 45 minutes, telling Manges that he was too legalistic and that his legalistic attitude was in conflict with his Orthodox faith. *Id*. In addition, Harman told Manges that he would never work as a community facilitator for the Orthodox community so long as Harman worked for the Department of Corrections. *Id.* Manges characterized Harman's behavior as aggressive and threatening [DE 120-14 at 1].

This final retaliatory act suffers from the same flaws as the last one. First, there is the disputed question of motivation. Harman claims that he was acting in his capacity as chaplain, counseling Harman on moral and ethical standards. If that's the case, then there is no retaliation issue. "Because the government has its own right of speech, there is no rule that public employees cannot inform private actors about their dissatisfaction with statements that the private actors have made." *Antoine*, 275 F. App'x at 541. Finally, there's the issue of whether Harman's behavior would deter a person of ordinary firmness. Manges claims Harman was "threatening," but threats alone are not actionable. *See id.*; *DeWalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000). So, once again, factual issues abound, and Manges is not entitled to judgment on this claim.

Plaintiff's motion for summary judgment is therefore **DENIED**.

**B.     Defendants' Motion for Summary Judgment**

Next up is Defendants' motion for summary judgment [DE 119]. Defendants have moved for summary judgment on all of Manges' claims. There are ten claims against six defendants so, to make things easier, I am going to break the claims into groups. First, I'll address, the free exercise claims. After that I'll focus, once again,  on the retaliation claims.

**1.     Free exercise claims**

The bulk of this lawsuit involves Manges' First Amendment right to exercise his religion. Prisoners like Manges retain their constitutional rights in prison. *Turner v. Safley*, 482 U.S. 78, 84 (1987). But a prisoner's rights are necessarily circumscribed as they must be balanced against the legitimate goals of the prison. *See id.* at 89; *Hadi v. Horn*, 830 F.2d 779, 783 (7th Cir. 1987). Therefore, prison regulations that impinge on an inmate's constitutional rights are still valid if they are reasonably related to legitimate penological interests. *Turner*, 482 U.S. at 89; *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349(1987).

To determine whether Defendants' actions pass constitutional muster I need to look at four factors: (1) whether a valid, rational connection exists between the regulation and the legitimate penological interest behind the rule; (2) whether there are alternative means of exercising the right in question that remain available to the prisoners; (3) the impact the accommodation of the asserted constitutional right would have on the guards, other inmates, and on the allocation of prison resources; and (4)

whether there are obvious, easy alternatives, although the regulation need not satisfy a least restrictive alternative test. *Turner*, 482 U.S. at 89-90. Manges has the burden of disproving the validity of ISP's regulations, but ISP must still articulate their legitimate governmental interest in the regulations. *See id.* at 89; *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).

I can say, with only slight exaggeration, that Manges has alleged a civil rights violation corresponding to each time he missed a mass at ISP. Altogether he has made six free exercise claims. These can be broken down into three groups. The first group consists of times when services were cancelled because of events outside ISP's control. The second group are claims arising out of the times when Manges couldn't go to Orthodox service because of bureaucratic mistakes. The last claim stands alone, as it arises from the time when Manges was barred from services as punishment for threatening Harman.

The last one is simplest. Count Two of the Complaint alleges that Chaplain Rogers violated Manges' rights by barring him from Eastern Orthodox services for thirty days because he had threatened Chaplain Harman. Prison officials undoubtedly have a legitimate interest in maintaining safety and security. *Bazzetta*, 539 U.S. at 133 (describing "internal security" as "perhaps the most legitimate of penological goals"); *McRoy v. Cook Cnty. Dep't of Corr.*, 366 F. Supp. 2d 662, 680 (N.D. Ill. 2005) (noting that a prison's interest in maintaining security "is certainly legitimate.") *aff'd sub nom. McRoy v. Sheahan*, 205 F. App'x 462 (7th Cir. 2006). In this instance, it was reasonable for Rogers to interpret Manges' statement—"I may have to kill a motherfucker to get back on the

list"—as a threat. And it was rational, and appropriate, for Rogers to temporarily bar Manges from group religious services in order to protect Harman, and, more generally, to deter violence and encourage safe, respectful behavior. *See May v. Libby*, 256 F. App'x 825 (7th Cir. 2007) (affirming grant of judgment as a matter of law for prison officials who curtailed prisoner's right to expression after prisoner's threatening letter); *Hadi*, 830 F.2d at 785 (prison officials do not need to wait for problem to arise before taking steps to minimize security risks). So a valid connection exists between ISP's interest in security and Rogers' action.

The other *Turner* factors do not help Manges' cause. Manges had alternative means to exercise his First Amendment rights as he had his bible and was able to pray in his cell. *See O'Lone*, 482 U.S. at 351-52 (prison policy denying Muslim prisoners access to a group religious service was not a constitutional violation when prisoners were allowed copies of the Koran); *Grant v. DeTella*, No. 96 C 2727, 1999 WL 966988, at *4 (N.D. Ill. Oct. 11, 2011) (prayer in one's cell is a legitimate alternative to communal worship). Second, Defendants argue, credibly I think, that a failure to respond to Manges' insubordination would damage staff credibility and be seen as ceding control in the face of Manges' dangerous behavior. *Turner*, 482 U.S. at 90 ("[w]hen accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of correctional officials."). Finally, Manges has not proposed any easy, alternative disciplinary action that would accomplish ISP's goals.

It is true that the parties dispute whether Manges actually threatened Harman.

But that doesn't matter for this claim because it is alleged against Defendants Rogers and Levenhagen, not Harman. There is no dispute that Rogers and Levenhagen believed Manges threatened Harman. And Manges does not argue that this belief was unreasonable. Therefore, Manges hasn't been able to come forward with facts that would allow a reasonable jury to conclude Rogers or Levenhagen violated his rights.

The next set of claims concern the times when Orthodox services were cancelled due to events outside of ISP's control. Counts Four and Five allege Manges' free exercise rights were violated when services were cancelled in June 2010 because volunteer leader Peter Bylen couldn't make it to ISP to lead the services. Count Seven alleges Manges' rights were violated when services were cancelled in May and June 2011 during the construction at the Religious Center and then again when Bylen cancelled services due to a family emergency.

With respect to the construction cancellations, the prison has an obvious interest in protecting prisoners from unsafe conditions. *Russell v. Richards*, 384 F.3d 444, 448 (7th Cir. 2004) (citing the obligation of prisons to protect the safety and well-being of inmates and personnel); *Van den Bosch v. Raemisch*, 658 F.3d 778, 785 (7th Cir. 2011) (same). And declining to hold religious services in a room with a collapsing roof is rationally connected to that interest. Manges concedes that the Religious Center was unsafe, but argues that prison officials should have come up with alternative spaces for worship more quickly than they did. This claim verges on the frivolous. As Defendants point out, *all* religious services at the prison were cancelled when the roof began leaking. Prison officials had to come up with safe, secure, cost-effective venues to

accommodate religious services for hundreds of inmates, not just the Orthodox community. This was no easy task. One potential site had recently flooded [DE 120-13 at 7]. As for the other site, administrators had to work around already scheduled events. *Id.* Still administrators were able to cobble together enough spaces to get religious activities up and running again in a matter of weeks.

I am not in a position to second-guess these kinds of complicated administrative decisions. *Koutnik v. Brown*, 456 F.3d 777, 785 (7th Cir. 2006) (explaining that courts owe substantial deference to the professional judgments of prison administrators). Even if the ISP administrators were dragging their feet as badly as Harman claims, those few extra weeks without religious services just don't represent a constitutional injury, especially since Manges could, at all times, read his bible, pray in his cell, and meet with the chaplains. *See Hadi*, 830 F.2d at 787 (occasional sporadic cancellation of religious services where other opportunities for worship were provided did not unreasonably impinge inmates' rights); *Rapier v. Harris*, 172 F.3d 999, 1006 n.4 (7th Cir. 1999) (*de minimis* burdens on free exercise of religion are not of constitutional dimension); *Buck v. Lake Cnty. Sheriff*, No. 03 C 1740, 2004 WL 2983966 (N.D. Ill. Dec. 23, 2004) (missing a few group services during brief confinement not actionable under § 1983).

The same holds for the claims relating to the handful of times Orthodox services weren't held because the lay volunteer had to cancel. As a general matter, four cancellations spread out over several years is a *de minimis* burden on Manges' rights. *Hadi*, 830 F.2d at 787; *Rapier*, 172 F.3d at 1006 n.4. Even if the burden wasn't *de minimis*, this claim doesn't pass the *Turner* test. The Seventh Circuit has repeatedly upheld

prison policies mandating outside volunteers lead religious services. *Kramer v. Pollard*, 497 F. App'x 639, 643 (7th Cir. 2012) (policy requiring volunteer leaders didn't violate constitution because prison has a legitimate security interest in preventing prisoners from assuming leadership authority over fellow inmates); *Johnson-Bey v. Lane*, 863 F.2d 1308, 1310 (7th Cir. 1988) (same); *Hadi*, 830 F.2d at 784 (same). A policy of relying on outside volunteers necessarily means that, on occasion, those volunteers won't be able to make it—family members get sick, cars break down, people go on vacation. In those instances, services may have to be cancelled. That's fine.  ISP was not obligated to go out and immediately find a replacement priest, or, as Manges suggests, make one of the Protestant chaplains pinch-hit, on the rare occasions that the Eastern Orthodox volunteer couldn't make it to the prison. *See, e.g., Doyle v. Prewitt*, 39 F. App'x 344, 347 (7th Cir. 2002) (prison's decision to cancel Muslim prayer service in the absence of imam did not violate free exercise clause); *Walker v. Dart*, No. 09 C 1752, 2010 WL 3307079, at * 10 (N.D. Ill. Aug. 19, 2010) (rejecting Free Exercise claim where there were no Muslim services for nine months due to the lack of outside volunteers).

Finally, the last group of claims are times when Manges missed Orthodox services because of bureaucratic inefficiencies. First, in September 2009, he was inadvertently left off of the Eastern Orthodox count letter. It took a couple of weeks for Chaplains Rogers and Harman to fix the problem and, in the meantime, Harman refused to give Manges a same-day pass to allow him to attend the service. Second, in August 2011, all religious services at ISP were suspended for a few weeks until count letters could be updated following a lock down at the institution. Again, Manges hasn't

come forward with enough evidence to stave off judgment as a matter of law.

Manges acknowledges that he was left of the count letter in 2009 by accident, but argues the chaplains should have either issued him a same-day pass or fixed the mistake more quickly. As far as the passes go, Defendants claim ISP policy barred them from issuing passes on the same day of an event [DE 120-1 ¶ 7; DE 120-3 ¶ 7; DE 120-4 ¶ 7]. And they justify the policy with an appeal to institutional order and security. These are, of course, legitimate goals. *See, e.g., Al-Alamin v. Gramley*, 926 F.2d 680, 686 (7th Cir. 1991) (both security and economic concerns are legitimate penological demands). The policy of cracking down on same-day passes rationally advances these goals by making it easier to keep track of prisoner movements and by cabining the discretion of individual prison employees. As previously stated, Manges had alternative means for exercising his religion. He was able to read the Bible, pray in his room, and speak with the chaplains. Manges has not been able to point to an easy alternative to the same-day pass rule that the prison could adopt. So this policy was justified by bona fide concerns and did not violate Manges' right to exercise his religion. *See O'Lone*, 482 U.S. at 351-52 (work schedule that caused Muslim prisoners to miss Friday group prayers did not violate constitution because it was justified by legitimate security concerns and the prisoners could worship in their cells).

Now, as Manges points out, the policy may have been inconsistently applied in practice. Manges seems to have been able to cadge a pass from Chaplain Rogers on at least one occasion [DE 120-9 at 1]. But imperfect enforcement doesn't mean the policy is irrational. It just means that, as the Supreme Court has pointed out, running a prison is

an "inordinately difficult undertaking" and one that courts are ill equipped to deal with. *Turner*, 482 U.S. at 84. Since Manges has not carried his burden of showing the same day pass regulation was irrational, Defendants are entitled to judgment on this claim. *Id.* at 90.

The delay in fixing the problem is not actionable either. Manges is, of course, entitled to opportunities to practice his faith, but he isn't entitled to perfection. *Jones v. North Carolina Prisoner's Labor Union, Inc.*, 433 U.S. 119, 125 (1977) ("Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system."). The fact that it took a couple of weeks to investigate and straighten out a clerical error is hardly a constitutional problem. *Rapier*, 172 F.3d at 1006 n.4 (*de minimis* burdens on free exercise of religion are not of constitutional dimension); *Boles v. Lecureux*, 19 F.3d 18 (6th Cir. 1994) (cancellations due to negligent errors in scheduling did not raise free exercise concerns). Especially when, as always, Manges had alternative opportunities to pray.

The count letter system, as I have mentioned, is a rational system for ensuring safe and orderly inmate movement. No system is going to work perfectly, especially at a large, complex institution like the Indiana State Prison. Lapses and mistakes will happen, but so long as the lapses are not unreasonable or extraordinary, there is no constitutional problem. *Rapier*, 172 F.3d at 1006 (prison's occasional failure to accommodate religious prisoner's needs did not violate constitution when prisoner presented no evidence that failures were caused by anything other than institutional shortages*); see also Owen v. Shuler*, 466 F. Supp. 5, 7 (N.D. Ind. 1977) (holding that *de*

*minimis* delays in mail delivery are unavoidable in any large insitution and do not implicate the Constitutional as long as they are not unreasonable), *aff'd mem.* 594 F.2d 867 (7th Cir. 1979). Manges has not come forward with evidence showing that the delay here was unreasonable.

The same goes for the delay in updating count letters in 2011. At that time, ISP had been on lockdown for nearly two months, which meant all religious services were cancelled [DE 120-1 ¶ 18]. During the lockdown prisoners continued to transfer in, out, and around ISP, so when the lockdown ended, the ISP chaplains needed to update the count letters to reflect the current prison population. That process took a few weeks [DE 120-15 at 6]. Manges argues that they should have figured it out sooner. He suggests the chaplains should have been working to update the letters during the lockdown so that they'd be ready when the lockdown ended. Maybe so. But I am not going to micro-manage the daily schedules of prison chaplains. *See Lewis v. Casey*, 518 U.S. 343, 387 (1996) ("The judiciary is ill equipped to deal with the difficult and delicate problems of prison management and . . . prison administrators are entitled to considerable deference."). Manges hasn't come forward with evidence showing the delays were unreasonable or were caused by anything other than lack of resources — in this case lack of time. Manges feels the prison chaplains should have worked longer or harder, but allocation of prison resources isn't Manges' job. *See Arnhold v. McGinnis*, 9 F.3d 112 (7th Cir. 1993) (prison has a legitimate interest in efficiently allocating limited prison resources). And it's not mine either. The First Amendment requires that ISP provide Manges with an opportunity to exercise his religion that is consistent with penological

goals. It does not require that ISP make group religious services an absolute first priority. *See Hadi*, 830 F.2d at 784; *Buck v. Lake Cnty. Sherriff*, No. 03 C 1740, 2004 WL 2983966 (N.D. Ill. Dec. 23, 2004) ("The law is clear that there is no absolute right to being able to attend group religious services."). All Manges has shown is that ISP didn't operate as efficiently as he would wish, but that isn't a constitutional problem.

## 2. Retaliation claims

Now I'll turn back to the retaliation claims. First up are the claims against Harman. As I've already discussed, Count Three alleges Harman retaliated against Manges for filing grievances by falsely telling prison officials that Manges had threatened him. Count Six alleges Harman retaliated by restricting Manges to essential Religious Center activities. And Count Nine alleges Harman retaliated by berating Manges at a June 2011 meeting.

Of these, Count Three will have to be decided at trial. If Harman lied to get Manges punished for filing a grievance, that would certainly make a reasonable person think twice about exercising their First Amendment rights. Manges could have faced very serious penalties. It is a disputed issue of fact whether actually did Harman lie about the threat, and the question will have to be decided by the jury.

Defendants argue that Harman should be protected by qualified immunity, but that doesn't hold water, as it is clearly established that prison officials cannot retaliate against prisoners for the exercise of their First Amendment rights. *Buise v. Hudkins*, 584 F.2d 223, 229 (7th Cir. 1978) ("[I]t is well established that an act in retaliation of the exercise of a constitutionally protected right is actionable under Section 1983"); *Babcock*

*v. White*, 102 F.3d 267, 274 (7th Cir. 1996) (same).

Counts Six and Nine are not going to trial. There are some disputed issues of fact, especially as regards causation. Harman claims he restricted Manges and held a private meeting with him because Manges was obnoxious, not because he filed grievances. But even if I accept Manges' story, these claims are still insufficient as a matter of law because Harman's actions weren't much of a deterrent.

As I alluded to earlier, the standard for a retaliation claim is whether the retaliatory act would deter a person of reasonable firmness from future First Amendment activity. *Bridges*, 557 F.3d at 552. Not every instance of retaliatory conduct counts. "It would trivialize the First Amendment to hold that harassment for exercising the right to free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from the exercise." *Id.* at 555. For instance, threats of violence by prison guards have been held not to amount to retaliation. *Antoine*, 275 F. App'x at 541; *Salem v. Spryes*, No. 12 CV 3065, 2014 WL 2698586 (N.D. Ill. June 13, 2014); *Boclair v. Beardan-Monroe*, No. 10-CV-978-SCW, 2012 WL 3835874 (S.D. Ill. Sept. 4, 2012). Nor did ordinary verbal abuse and low-level harassment qualify. *Heard v. Hardy*, No. 11 C 6683, 2013 WL 3812102 (N.D. Ill. July 22, 2013) (overly-tightened handcuffs, making prisoner stand for hours in shower area and teasing him about his father's passing were not actionable retaliation). In *Mitchell v. Baker*, No. 13-cv-0860-MJR-SCW, 2014 WL 793353 (S.D. Ill. Feb. 26, 2014), one court even held that a guard's explicit threats of violence, including pointing a gun at the prisoner's head, were not actionable retaliation.

Manges claims Harman retaliated against him in two ways. First, he restricted

Manges to essential religious activities, preventing Manges from helping set up for Orthodox services. Second, he spoke to him about filing grievances in a threatening manner at a meeting in June 2011. Neither of these actions would deter a person of ordinary firmness from exercising their rights. First, threats alone are not actionable retaliation. *See Antoine*, 275 F. App'x at 541; *DeWalt*, 224 F.3d at 612. So even if Chaplain Harman was as menacing as Manges maintains, the June 2011 meeting cannot be the basis of a retaliation claim. The restriction on Manges' activities doesn't make the grade either. Harman just took away a perk. If physical and verbal harassment do not deter ordinary prisoners from filing grievances, Harman's light reprimand was not going to do so either.

Now it's on to Defendants Wilson and McBride. Manges alleges McBride and Wison had a hand in the same two retaliatory incidents—Manges' removal from non-essential Religious Center activities and the June 2011 meeting with Harman. But as I just explained, Defendants are entitled to summary judgment on these claims because the alleged retaliatory acts would not deter a person of ordinary firmness from exercising their First Amendment rights.

There is still one claim more to resolve. After filing the amended complaint, I granted leave for Manges to file a supplemental claim alleging Wilson retaliated against him by having him transferred to Pendleton Correctional Facility [DE 34-1]. I suspect that Manges would have had a hard time coming up with evidence to support this claim, but he was spared the trouble because Defendants neglected to brief the issue. This means they waived their arguments against the claim. *Narducci v. Moore*, 572 F.3d

313, 324 (7th Cir. 2009) (holding arguments not raised in brief for summary judgment are waived); *Wolotka v. Sch. Town of Munster*, 399 F. Supp. 2d 885, 901 (N.D. Ind. 2005) (same). As a result, the supplemental claim will have to be decided at trial.

\* \* \*

To sum up: Defendants are *not* entitled to summary judgment on two claims: Count Three against Defendant Harman and the supplemental claim [DE 34-1] against Defendant Wilson. Defendants are entitled to summary judgment on all other claims. I will set this matter for a trial in a forthcoming order.

## CONCLUSION

Plaintiff's motion for summary judgment [DE 127] is **DENIED**.

Defendants' motion for summary judgment [DE 119] is **GRANTED IN PART** and **DENIED IN PART**. Specifically, Defendants' motion is **DENIED** with respect to Count Three of the amended complaint as alleged against Defendant Harman. And is **DENIED** with respect to the supplementary claim alleged against Defendant Wilson.

Defendants' motion is **GRANTED** with respect to all other claims.

**SO ORDERED**.

ENTERED: October 29, 2014       <u>s/ Philip P. Simon</u>
                                           PHILIP P. SIMON, CHIEF JUDGE
                                           UNITED STATES DISTRICT COURT